MARGARET JANE MCEVILLY *et al.* Appellees, *vs.* ALFRED S. BROWNFIELD *et al.* Appellants.

*Opinion filed February 20, 1913—Rehearing denied April 3, 1913.*

1. PUBLICATION—*affidavit of non-residence may state places of residence upon information and belief.* It is the duty of the complainant in a chancery proceeding to make due and diligent inquiry to ascertain the place of residence of non-resident defendants; but the affidavit of non-residence is not bad because it states such places of residence upon information and belief and not positively upon personal knowledge.

2. WILLS—*when a decree setting aside a will will be reversed.* A decree setting aside a will upon the ground that the testator was of unsound mind will be reversed where the evidence for the proponents tends clearly to show that the testator was of sound mind when the will was executed, and the evidence for the contestants, though accepted as true, does not raise a well grounded suspicion that he was of unsound mind at that time.

3. SAME—*what evidence is not admissible upon question of testator's soundness of mind.* Testimony by a justice of the peace that on an occasion when the testator and his wife were having a contract drawn by him, under which a son of the testator was to manage the latter's farm, another son came in and objected to having the contract made and held a heated conversation with the justice showing a bitter feeling towards his brother, during which conversation the testator said nothing, is not admissible upon the question of the soundness of mind of the testator.

4. SAME—*when manner of presenting opinion of witness as to testator's unsoundness of mind is improper.* Where a justice of the peace has testified that the testator came to his office and asked him to write a new will and that the witness suggested that the testator go to a lawyer to have the will prepared, it is improper to permit him to testify, over objection, that the reason he made the suggestion was that he did not regard the testator as competent to make a will.

APPEAL from the Circuit Court of Champaign county; the Hon. SOLON PHILBRICK, Judge, presiding.

THOMAS J. ROTH, RAY, DOBBINS & DOBBINS, and H. I. GREEN, for appellants.

258 – 4

Joseph P. Gulick, and Herrick & Herrick, for appellees.

Mr. Justice Vickers delivered the opinion of the court:

Four of the children of Joseph F. Brownfield, deceased, filed a bill in the circuit court of Champaign county to set aside the last will of their father on the ground that he was of unsound mind at the time the will was executed. Four other children of the testator and certain grandchildren to whom legacies were given were made parties defendant. A summons was issued and served upon the resident defendants, and others who were non-residents were served by publication. Some of the non-resident defendants were minors and they answered by guardian *ad litem*. An issue of fact was made up as to the unsoundness of the testator's mind, which was submitted to a jury. The verdict of the jury was for the contestants upon the issue of mental capacity. The court overruled a motion for a new trial and entered a decree setting aside the will and the probate thereof, to reverse which the defendants below have brought the record to this court by appeal.

Some of the questions argued in the briefs have been eliminated by amendments and need not be considered. Appellants' point as to the sufficiency of the return of service of the summons upon the resident defendants, and appellees' contention that the bill of exceptions fails to show a motion for a new trial, have been obviated, the former by an amendment of the sheriff's return to the summons showing due and proper service, and the latter by a supplemental transcript filed by leave of this court which contains an amendment to the bill of exceptions showing that a motion for a new trial was made by the defendants below and overruled.

Appellants contend that the affidavit of non-residence was insufficient to give the court jurisdiction of such of the adult non-resident defendants as did not answer and of

the infant non-resident defendants who answered by their guardian *ad litem*. The affidavit of non-residence states unequivocally that certain defendants (naming them) are non-residents of the State of Illinois and states their places of residence on information and belief. The contention is that the place of residence should be stated positively, upon personal knowledge. This contention cannot be sustained. Where a defendant in chancery is a non-resident the statute makes it the duty of complainant to make due and diligent inquiry to ascertain his place of residence, and in case he is able upon such inquiry to ascertain the place of residence, to state it in the affidavit, so that notice may be mailed to such non-resident defendant. The knowledge of the place of residence of a non-resident defendant would ordinarily be obtained as a result of that due and diligent inquiry which is required, and when so obtained it is necessarily based on information and belief. The statute does not require the complainant to make a tour of foreign States to verify information as to the residence of defendants, in order that he may be able to state in his affidavit, on personal knowledge, the residence of such defendants. The affidavit upon which publication was had is sufficient. *Rowand* v. *Carroll*, 81 Ill. 224; *Fitch* v. *Gray*, 162 id. 337.

Appellants' most serious contention is that the court erred in not granting a new trial on the ground that the verdict is contrary to the clear weight and preponderance of the evidence. To determine this question it will be necessary to examine the evidence.

Joseph F. Brownfield, the testator, was eighty-three years of age when, on the 19th day of November, 1904, the will in question was executed. He came to Champaign county in 1833, then a boy about twelve years of age. He resided in said county until the time of his death, which occurred June 11, 1911. He had no education and was unable to read and write. There is some testimony that in his earlier life he could read a little plain print.

He was a pioneer farmer of Champaign county. He was married and raised a family of eight children,—four sons and four daughters,—all of whom survived him. The four daughters had married and left home more than forty years before the will in question was made. John, one of the sons, lived on a farm near his father but had had no intercourse with him for more than forty years. Elias, another son, had been away from home for about the same length of time. The two youngest sons, Alfred and Joseph, lived with or near their father all of their lives until about the time of the making of the will. The testator and his wife lived in the old homestead on the farm until her death, which occurred in January, 1904. The testator had acquired title to about 222 acres of valuable farm lands. This was in two farms,—one of 120 acres and the other of 102 and a fraction. For some time prior to the making of the will his son Alfred had occupied the 102-acre farm in section 2, while Joseph lived near his father and cultivated the home farm, each of the sons paying their father one-half of the grain grown, as rent. A short time before the death of the mother Joseph invested in property at Greeley, Colorado, and removed to that State. After Joseph went to Colorado it was arranged for Alfred to occupy the home farm, and a written agreement was prepared between Alfred and his father and mother fixing the terms upon which the home farm should be cultivated by Alfred. This contract does not appear to have been signed, although all the parties to it accepted its terms and carried out its provisions. For several years prior to her death the testator's wife was afflicted with rheumatism and was under the care of Dr. J. W. Fuqua, who had been the family physician of the testator for a number of years, and continued to be until he removed to Greeley, Colorado, in the early part of 1904. The evidence shows that during the six or seven years prior to 1904 Dr. Fuqua visited the testator's wife professionally more than one hundred times;

that he was thus brought into very intimate relations with the testator; that during all of these years he was never called upon to treat the testator for any disease whatever, and that he never was called upon to examine the testator professionally with one exception, when, at the request of his wife, he made an examination to see whether the testator was suffering from pneumonia; that on this occasion the physician made a careful examination of the testator's lungs and heart. Dr. Fuqua did not see the testator after he (the doctor) removed to Colorado until after the will had been executed. His testimony will be referred to more particularly hereinafter.

The evidence shows that some years prior to the death of the testator's wife he had executed a will. The provisions of the first will are not important. It also appears from the evidence that the testator had frequently consulted William B. Webber, an attorney at law, who resides in Urbana. Mr. Webber had been the attorney and adviser of the testator for a number of years. He had drawn the first will and attended to other legal matters for the testator. On the day that the will in question was executed the testator went to the office of Mr. Webber, in Urbana, and informed him that his wife was dead and that he wanted Mr. Webber to draw another will. The first will had been left in possession of Mr. Webber. Mr. Webber testified that he was seventy-five years of age and a lawyer by profession, and had been practicing in Champaign county since 1864, and that he was still practicing in that county; that he had no interest whatever in the result of the litigation and had not been employed by either party or consulted since the present suit was started; that he had known Joseph F. Brownfield from 1860 or 1861 down to the time of his death; that he had acted as his attorney on a few occasions; that the will in question was written by him and signed by the testator in his presence; that Charles Webber was in the office at the time the will was drafted, engaged

at another desk; that the testator said, "You drew a will for me some time ago in which I provided for my wife; now my wife is dead and it requires another will to be drawn." Thereupon Mr. Webber got the other will from his safe and read it over to the testator, and the testator told him the various changes he wanted to have made in the will; that he told him that he wanted his four daughters to have $1000 each and that he wanted to give the land to the two boys, Joseph and Alfred; that he said that Elias and John had already been given something or had already been provided for, and he said, "I want to give them $100 apiece." Mr. Webber took a memorandum of the new will in accordance with the statements made by the testator. A map or plat of Champaign county was produced, and the testator told Mr. Webber that he had land in Somer township, section 2, and also some in sections 15 and 23 in the same township, and told Mr. Webber the quantity of land in the different townships, and Mr. Webber took the map and the two looked over it together. It was an atlas of Champaign county, which showed the names of the land owners printed across the face of the map. Mr. Webber found the land in the name of the testator, as he had stated. The testator told Mr. Webber who owned land adjoining his, to aid him in locating the testator's land, and it was found on the map as he stated it to be. Mr. Webber testifies that the testator told him that his son Alfred was connected in some way with the land in section 2, but Mr. Webber was not able to remember just what he said on that subject. The testator gave detailed directions for the disposition of his household furniture, and mentioned the names of the grandchildren to whom he desired to devise property. Mr. Webber made memoranda while the testator was giving directions and then wrote the will from his notes. After it was written he testifies that he read it over to the testator and explained each clause as he went along, and after he had finished

reading it the testator said, "That is the way I want it," whereupon he signed the will by mark and the two Webbers witnessed his signature. The testator asked the two Webbers to sign the will as witnesses. After the new will was thus prepared and executed the old will was destroyed there in the office. The will in controversy was left in the custody of Mr. Webber and he held it until the testator died. This witness testifies that he had frequently seen and conversed with the testator prior to the day the will was executed. He testifies that at the time he signed the will Joseph F. Brownfield was of sound and disposing mind and memory. He says that it was his opinion then that he was of sound mind and memory, and that he had sufficient mental ability to understand and know what property he had, to know the natural objects of his bounty and to know and understand the result of making a will, and that he was abundantly competent at that time to transact the ordinary business affairs of life, and that there was no restraint or influence exerted upon him whatever to induce him to execute the will. Mr. Webber testifies that after the transaction was over the testator asked him how much his fee was, and that he told him what the charge was, and that the testator took the money from his pocket and paid his fee. The testator's daughters are referred to in the will by their maiden names. This circumstance is explained by Mr. Webber in his testimony, who says that the testator in speaking of his daughters did not know how to spell some of their names and that Mr. Webber was in some doubt from the pronunciation that was given him by the testator, and that he suggested that they be described by their maiden names, and this was done.

Charles M. Webber, who was in the office at the time the will was executed and was one of the witnesses thereto, testified that he was secretary of a building and loan association; that he had held the office of county clerk of Champaign county, and that he knew Joseph F. Brown-

field, the testator, and had known him for fifteen years prior to the date of the execution of the will. He corroborates the testimony of W. B. Webber in so far as his attention was directed to what was taking place. He did not attempt to follow the conversation between the parties and does not attempt to detail it. He testifies to the fact that a will was being prepared and that he was called upon by the testator to witness it, and that he did so; that he had no occasion to specially observe the testator on that occasion; that he had met him a great many times and conversed with him, and that he was intimately acquainted with him; that at the time the will was executed the testator was of sound and disposing mind and memory, and that was his opinion at that time, and that he believed he had sufficient mental ability to remember his relatives and children and to know what property he had and the value of it, and that he would understand the effect of making a will. He gave it as his opinion that the testator understood the full meaning of all that took place at that time and that he had good ordinary ability to transact business affairs; that none of the relatives of the testator were present and that he was entirely free from any restraint or influence during the transaction.

Dr. J. W. Fuqua testified that he was a practicing physician, a graduate of Rush Medical College, of Chicago, forty-eight years of age, and had been practicing since 1895; that he practiced at Urbana, Illinois, up to the 16th day of December, 1903, when he removed to Greeley, Colorado, where he has been practicing his profession since; that he knew Joseph F. Brownfield intimately and had been his family physician from 1896 until he left Urbana; that he treated his wife for several years, visiting her from two to three times a week, and that he always saw the testator on these occasions except one time; that in addition to this he frequently met him at his office. He testifies that in May, 1905, the testator came to his office in

Greeley, Colorado; that he explained to him that he had come out to visit his son Joseph; that he had not written that he was coming and wanted to surprise his son. Joseph Brownfield resided in the country about six miles from Greeley. Dr. Fuqua testifies that he conversed with the testator that evening until a late hour, and that next morning he asked the doctor to call Joseph Brownfield over the 'phone and tell him to come to town but not to tell him who was there; that the testator remained in Colorado all of that summer, making his home with his son Joseph; that he frequently saw him during the summer in Greeley; that he made trips over the mountains, and that he took four of his grandchildren up on the Moffatt road on a sight-seeing trip; that he went as far as Toland and got off the train, ate his lunch there with the children, and then walked about on the mountains, gathering flowers, until the train returned on which the party came back. He also testifies that "Uncle Joe," as he is called in the record, made a trip to Cheyenne, Wyoming, with four of his grandchildren to attend Frontier day; that he came back very much delighted with his trip and told with great interest what he had seen, how the men rode the bucking horses, the cowboys roped cattle, and the like; that in the fall of the year 1905 the testator prepared to leave Colorado and return to Illinois; that the doctor asked him why he did not stay all winter out there, and he said that he had corn to dispose of and other matters to settle up which made it necessary for him to return to Illinois; that he also said that he had a sister living somewhere in Nebraska, and that he wanted to go by and see her and then would go on to Urbana from there; that he left Colorado expressing an intention to come back the next year; that he went about over the country observing the method of irrigating for crops and took a deep interest in the methods of farming in that State. Dr. Fuqua testifies that he saw no indications of senile dementia or other mental trouble; that he

was in the possession of his faculties and was an unusually strong and vigorous man for one of his age. This witness details numerous conversations with the testator while he was in Colorado, which indicate that the testator was in the full possession of his memory and his other mental faculties. He was able to recall and discuss with Dr. Fuqua transactions with people and events that had occurred in Illinois in which Dr. Fuqua was interested.

Sherman Katterman, a painter and decorator, testified that about the first of November, 1904, he met Mr. Brownfield, who told the witness that he wanted him to paint his house; that he got ready to do the work and the testator asked him what the charge would be and was told that it would be $25; that the testator said that he would not give that,—that it was one dollar more than he had paid the same man for painting it in 1893. The witness testifies that he had painted the same house in 1893 for $24. The witness testifies that he remained at the testator's house during the time that he did this work; that he conversed with him and talked about politics; that testator said he was going to vote for Parker, and told the witness that if he was going to vote for Roosevelt he might just as well stay at home, as he was going to go and vote for Parker and would kill his vote; that when the painting was done the testator paid $25, counted the money and handed it to the witness; that the testator went for and purchased the material for the job; that the witness made out the bill and the testator bought the paint and other material and brought it to him. This witness testifies that from his business transactions with the deceased and his acquaintance with him he thought he was mentally competent to transact his ordinary business affairs and able to understand his property matters. The above transaction occurred during the early part of the month in which the will was executed.

In addition to the witnesses whose testimony has been specially referred to, about thirty of the neighbors and ac-

quaintances of the testator, most of whom were farmers, testified to a more or less intimate acquaintance with the testator for a number of years prior to the time when the will was executed. Many of these witnesses detailed conversations and business transactions with the testator, and they all agree that the testator was a strong, healthy man for one of his age and that he was in the full possession of his mental faculties. He owned a horse and buggy, and usually went about the neighborhood, wherever he had occasion to go, alone in his buggy. He transacted business with the road commissioners, with his banker, with the grocers, attended church, hard road meetings, and apparently appreciated and participated in the events that were taking place in his neighborhood. He was an old man and made no pretense of working or carrying on any business. He had plenty of leisure, and spent much of it, after his wife's death, in visiting among his old neighbors and acquaintances. He bought a phonograph after his wife's death and amused himself by playing it. He frequently would take his phonograph with him when visiting with his neighbors and friends, when invited so to do, and would spend several hours entertaining himself and his friends playing this musical instrument. In 1907 he had the smallpox, and he also had an apoplectic stroke, which further enfeebled his mind and body. After these attacks his friends and acquaintances began to notice that he was failing mentally. It was thought that it was not prudent to allow him unrestrained privileges and a conservator was appointed for him. A number of witnesses were introduced who testified to the condition of the testator in 1907 and subsequent years. A physician who saw him for the first time in 1907, testified, over the objection of the appellants, that in his opinion the testator must have had senile dementia in 1904, when the will was executed. None of the witnesses for the appellees who express opinions unfavorable to the mental capacity of the testator at the time the will was executed

had seen him or had any transactions or conversations with him at or very near the time when the will was executed. Every fact testified to by the witnesses for appellees may be true and still not be inconsistent with the entire sanity and soundness of mind of the testator on the day the will in question was executed.   There is no proof in this record that the testator had any delusions.   It is true that, like many persons of his age, he lived in the past to a large extent.   His memory of events that occurred years ago was better than of more recent occurrences.

A number of witnesses for appellees testified to conversations and transactions with the testator, some of them before and some subsequent to the time when the will was executed, and, relying upon such observations, express the opinion that he must have been of unsound mind on the 19th day of November, 1904.   A number of these transactions and conversations are quite remote from the date of the will, and none of them are so unusual or extraordinary as to afford certain indications of mental unsoundness. For instance, Thomas Brownfield, a brother of the testator, testified that the deceased visited at his house frequently after his wife died; that he generally came in his buggy, drawn by an old horse; that when the testator was there he talked about just anything that came up; that when he came to his house he drove up, got out of the buggy, came in the house and left him to take care of the horse; that he would stay two or three days at a time and until he got ready to go, and did not attend to his horse during the time he was there; that he went around town visiting friends a part of the time when stopping at his brother's house; that he and the testator would talk about things that happened a long time ago, and that the testator was better posted on things "way back than he was on present things;" that he did not keep his person as clean as some people, but witness concedes that he "tried to be pretty clean;" that his wife had been an invalid for several years before her death; that he

did not keep himself as tidy after her death as he did before; that he had a phonograph and "acted like he thought it was a pretty nice thing;" that he had paid $80 for it and that it was the best he had ever seen; that he had quite a number of records with him and played them on the phonograph. He testifies that on one occasion his brother came to his house and seemed to be in a hurry and left his horse there; that he said, "I have made a will and it 'aint the way I want it, but I will leave the horse here and go and fix it," and he went away and came back in the evening; that witness remarked to him, "I reckon you got your will fixed the way you want it," and the testator replied, "I did not;" that witness said, "You had better go back and have it fixed;" that the testator said he did not have time,—that he was going home,—and witness advised him to go back in the morning and have his will fixed. The foregoing are conversations and transactions detailed by a brother of the deceased, and from them he expresses the opinion that the testator was of unsound mind on the 19th day of November, 1904. This witness also states that on the day the will was made the testator was "bad off," but it will be noted that he does not testify to having seen the testator on the day the will was made. There is nothing in any of the facts stated by this witness which indicates that the testator was of unsound mind, and it is significant that he advised and urged his brother to have his will fixed the way he wanted it. It might be pertinent to inquire if he believed his brother was so mentally deranged as to be incapable of making a will, why should he advise him to go and have the will fixed the way he wanted it? It seems a little unusual that one would advise an insane brother to make a will.

Martha Brownfield, the wife of the preceding witness, testifies to the frequent visits of the testator at her house, and she thinks he was of unsound mind because he seemed pleased when people would praise his phonograph, and be-

cause in passing people in his buggy on the highway he did not always recognize and speak to them. But in fairness to this witness it should be said that she, in answer to the question as to whether or not the testator was of sound or unsound mind in November, 1904, went no further than to say, "I do not think he was extra sound."

W. F. Hardy, a dealer in agricultural implements in Champaign, testifies to an acquaintance with the testator for fifty years prior to his death. He details no transactions or conversations with the deceased during his acquaintance, but expresses the opinion that he was a "rather weak and simple-minded old man," and grew worse with age. He says that testator was never a strong-minded man during the fifty years that he knew him.

W. J. Lowe testifies that he was formerly ticket agent for the Wabash railroad; that some time prior to 1902 the testator came to the railroad station bringing his wife with him on a cot; that he wanted to take his wife to Kirksville, Missouri, for treatment; that witness made arrangements by wire to send them by way of St. Louis; that the tickets were bought and the testator and his wife were put aboard the train; that the old lady had to be transported in the baggage car and her husband remained with her. This witness testifies that some time afterwards the old gentleman came into his office early in the morning and that he was crying and excited; that witness asked him what was the matter, and was told that he had come up on the train the night before and that the conductor had carried him by his station several miles; that when it was discovered that he was on the train and had no ticket the train was stopped and he was put off between stations, in the dark and alone, and that he had wandered about and finally made his way into Champaign by the aid of some one, and he got into the station and remained there until morning; that witness took a statement from the old man of the occurrence and notified the passenger department of

the railroad company, and the passenger department laid off the conductor and required him to go to Mr. Brownfield and apologize, as a condition upon which he could again return to work; that the conductor came to the station and the witness told him that Mr. Brownfield lived some distance in the country; that the conductor got a rig and he and the witness drove to Mr. Brownfield's house, and when Mr. Brownfield saw the conductor he refused to talk to him until the witness explained that the conductor had come out to apologize for putting him off the train; that then the testator listened to his apology and it seemed to satisfy him. This witness testified that this transaction occurred, he thinks, some time around 1902, but he is manifestly mistaken about the time, since the other evidence shows, without contradiction, that the old man only made one trip to Kirksville with his wife, and that occurred in 1899. This witness does not go to the extent of saying that he regarded the testator as of unsound mind but considered him "just an old man in his dotage."

There is nothing strange in the fact that the testator, after having been forcibly ejected from a train between stations at one o'clock in the night, and having wandered about, not knowing which way to go, until he found himself the next morning in the railway station, where he had taken refuge from the inclemency of the weather, should manifest some feeling and find some difficulty in controlling his emotions in his conversation with the ticket agent. The testator was at this time nearly eighty years old, and he had intelligence enough to appreciate that he had been subjected to a great indignity and hardship without any fault of his, and he very naturally felt some degree of resentment toward the conductor, whom, with accurate discrimination, he seemed to have held responsible for his mistreatment. The testator showed no hostility toward the station agent. He apparently recognized the conductor as the responsible party for his having been put off the train.

He at first refused to talk to him, but when he was assured by Lowe that the conductor wanted to apologize to him he relented, listened to the apology and seemed to feel better. We see nothing in all this to indicate that testator was not in full possession of his faculties, still such circumstances are relied on to show that Mr. Brownfield was not competent to make a will in November, 1904,

Grace Kitchen and her mother testified that on one occasion when the testator was at their house, visiting and playing his phonograph, he said to Grace, then a child fifteen years old, "Grace, lets you and I get married," and Grace said, "Where will we live?" and he replied, "Well, we could live up at the place where Alf is," and finally Grace said, "Why, I am too young and you are too old." To this no reply was made. The testator had his horse and buggy there and invited Grace to go up to town with him and promised to buy her a bracelet. This conversation was in the presence of the girl's mother, and with her consent Grace went to town in the buggy with the testator. Grace testifies that the old gentleman did the driving; that he talked about his horse and how he could make it kick by using the whip, and other commonplace subjects; that before leaving the house the old man said, "I have been here two or three days," and insisted on giving Grace a dollar. These witnesses say that he had not been there three days, but that he seemed to have the impression that he had been and wanted to pay something for his entertainment, and that the dollar was given to the little girl. When they got to town the testator did not buy Grace a bracelet. He said nothing more about it and neither did she. This transaction occurred in April, 1904. Both Grace and her mother expressed the opinion, based on this occurrence, that the testator was of unsound mind and unable to understand the ordinary business affairs of life in November, 1904.

Martin Brownfield, a justice of the peace and a distant relative of the testator, testified to a number of conversations and transactions with the deceased. He testifies to writing contracts for the deceased, particularly the lease between the testator and his son Alfred for the home place, and that John Brownfield came into the testator's house while the witness was there and objected strenuously to any contract being written which would permit Alf to come into the occupation of the home place. He details a heated conversation between himself and John in the presence of the testator and his wife. The testator said nothing and took no part in the conversation. This evidence was admitted over the objection of appellants. It was improper and should have been excluded. The effect of it was merely to show that there was a bitter feeling on the part of John Brownfield against his brother Alfred, and that he was apparently afraid that if his brother Alfred came into the possession and occupancy of the homestead he might obtain an advantage in some way over him in the distribution of the estate. It had no tendency whatever to show the condition of the mind of the testator. The evidence is, that while John was abusing his brother Alf and cursing him in the presence of his invalid mother and aged father, the old man walked out of the room and said nothing, and that the mother, who was unable to help herself, broke down and cried and said that she did not see why John acted that way. The witness remained, however, and wrote the contract at the dictation and suggestion of these two old people. This is the contract heretofore referred to as never having been signed, but it was nevertheless carried out by the parties. This witness also testifies that "Uncle Joe" called on him to write the new will, telling him, as he told the lawyer who did, in fact, write it, that since his wife had died he wanted to change the will. This witness suggested to the testator that he go to a lawyer and have the will prepared. He was permitted to say, over

objection, that the reason he did so was that he did not regard the testator as competent to make a will. This was improper. The witness should have been limited to a statement of the facts, and then to the expression of an opinion, based upon those facts, as to the mental capacity of the testator at the time the will was drawn.

We have thus reviewed the most important facts developed by the testimony in so far as they throw light on the mental condition of the testator when the will was executed. The testator lived seven years after the date of his will. He was about ninety years old at the time of his death. After he had the small-pox, in 1907, and the stroke of apoplexy, there is abundant proof that his mind failed and that he was a sufferer from senile dementia. This testimony we have not thought important to consider, since, whatever his condition may have been from 1907 up to the time of his death, that condition is not inconsistent with testamentary capacity in 1904. We have not attempted to review in detail all of the testimony or to refer to that given by each witness on either side. We have, however, read the entire testimony and considered it carefully, and when the proper testimony bearing upon the mental capacity of the testator at the date of the execution of the will is considered, there is not enough testimony tending to sustain appellees' contention to raise a suspicion in our minds that the testator was of unsound mind at that time. The record in this case will be searched in vain for a well established act of the testator, prior to the time the will was executed, that is inconsistent with his testamentary capacity. The testator was an uneducated farmer. He had lived and moved within the radius of a comparatively small circle. His life was of that simple, frugal character that one would expect of a man in like circumstances. He worked upon his farm, grew crop after crop and marketed the same, did a little banking business, and his other business transactions were limited to the usual and ordinary

transactions which became necessary in the course of his farming business. He was devoted to his invalid wife, whom he watched over and nursed tenderly until she was taken from him. Some of the witnesses say that they noticed a change in the testator after his wife died. This is not surprising. This aged couple had lived together as husband and wife for more than sixty years. They were devoted to each other. It was nearly forty years since the last of their children had married and moved away. When his wife died the testator was eighty-three years of age. After she was taken from him he was left alone. The evidence shows that he was very much depressed after his wife died; that he frequently said that "she has gone and I do not care how soon I may follow her." While under the shadow of a grief so appalling it is not surprising that this old man would occasionally pass persons on the roadway without recognizing them. It was after the death of his wife that he purchased the phonograph which afforded him so much entertainment. His interest in the phonograph, as well as other manifestations of a change in his life and conduct, is readily explainable by the fact that he had lost his life partner. The evidence, however, shows that he recovered to a great extent from the effect of his bereavement. As already pointed out, he spent much of his time among his neighbors and friends and became cheerful. In the spring of 1905, after the will was executed, he went to the bank, drew out $160, bought a new suit of clothes and went to Greeley, Colorado, to visit his son. There can be no doubt that he was entirely rational at this time. He made his plans and preparations for the trip, purchased his ticket and went alone. He consulted no one and received no assistance. During the entire summer and fall that he was at Greeley his conduct was that of a man in the full possession of his faculties. There was no suspicion that he was not entirely able to take care of himself and attend to his own affairs then as well as at any previous time in

his life. If he had been suffering from senile dementia, which is known to be an incurable and a progressive disease, in November, 1904, it is inconceivable that he would be able to make the long trip to Colorado alone; that he would during the entire summer of 1905 be able to go about looking at mountain scenery, taking his grandchildren with him to attend Frontier day at Cheyenne,—in short, to do all of the things that any reasonable and rational man under like circumstances would have done. These facts are not disputed by anyone, and we have the testimony of Dr. Fuqua, who knew him very intimately, that there was nothing in the conduct or appearance of the testator in 1905 to indicate that he had any symptoms of senile dementia. This testimony, when considered in connection with that given by the two Webbers, who saw the testator and conversed with him on the day the will was executed and whose opportunity to form an opinion as to his mental capacity on that day was much better than that of any of the other witnesses who have testified, removes every doubt of the soundness of the testator's mind on the day the will was executed.

Appellants have assigned numerous errors upon the rulings of the court in giving and refusing instructions and upon the admission of the testimony. Under the view that we have of the merits of this controversy it is not necessary to notice these assignments of error. The verdict of the jury is so clearly against the evidence that the decree based thereon cannot stand, regardless of all other questions. The evidence is not sufficient, in our opinion, to raise a well grounded suspicion that the testator was of unsound mind on the day he executed his will.

The decree of the circuit court of Champaign county is reversed and the cause remanded.

*Reversed and remanded.*